## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Rose Hill Villas Owners Association, Inc.,

                Plaintiff,

v.

American Family Mutual Insurance
Company,

                Defendant.

Case No. 20-cv-2191 (ECW)

**ORDER**

---

This matter is before the Court on Cross-Motions for Summary Judgment by Plaintiff Rose Hill Villas Owners Association, Inc. ("Rose Hill") (Dkt. 17); and Defendant American Family Mutual Insurance Company ("American Family") (Dkt. 24). The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636 and Rule 73 of the Federal Rules of Civil Procedure. (Dkt. 11.) Plaintiff Rose Hill moves the Court for an Order: (1) vacating an August 11, 2020 appraisal award, and American Family seeks an Order confirming the August 11, 2020 appraisal award. For the reasons stated below, the Court grants American Family's Motion for Summary Judgment, denies Rose Hill's Motion for Summary Judgment, and confirms the August 11, 2020 appraisal award.

## I.      FACTUAL BACKGROUND

### A.    General Background

Rose Hill is a non-profit common interest community consisting of the homeowners of 10 multi-unit residential townhome buildings located in Inver Grove

Heights, Minnesota.  (Dkt. 20 ¶ 2.)

On September 24, 2019, the Rose Hill property sustained wind and hail damage. (*Id.* ¶ 3.)  At the time of the loss, the property at Rose Hill was insured under a Business Owners insurance policy issued by American Family that insured the property against, among other things, wind and hail.  (*Id.*)

After the loss occurred, Rose Hill reported the loss to American Family.  (*Id.*)

**B.     Disagreement by the Parties as to Cost of Repairs**

American Family investigated and adjusted the loss with respect to the Rose Hill properties and determined there was damage to roof metals, including the valley metal and vents.  (Dkt. 20-2.)  On October 14, 2019, American Family provided to Rose Hill repair estimates for each of the 10 buildings, the scope of which included removal and replacement of shingles around the damaged metal components that were to be replaced. (*Id.*)

On December 17, 2019, Rose Hill's counsel sent a letter that included an estimate and scope of repair from Allstar Construction & Maintenance ("Allstar"), disagreeing with the scope of the repairs and the cost of the repairs.  (Dkt. 20-1 at 1.)[1]  Rose Hill's counsel took issue with American Family's scope of replacement for the roof, which entailed replacing only shingles around the damaged metal components (a "partial replacement" or "patching") rather than a full replacement of all shingles, because the

---

[1]     Page references in this Order reference the CM/ECF page number except with respect to deposition citations, which in such instances refer to the page of the deposition testimony.

shingle used on the buildings, which was an Atlas Franklin Pinnacle Pristine shingle, had

been discontinued in 2015, and the current (or "new") Pinnacle Pristine with HP

technology shingle was a different shape, size, and exposure:

> The current shingles on the roofs of Rose Hill Villas are the Atlas Franklin old style Pinnacle Pristine Shingle. We have enclosed as Exhibit D, the Discontinuation notice for those shingles. There are two (2) primary issues with the proposed replacement scope from the roofs.
>
> First, as stated in Exhibit D, the direct replacement shingle for the Pinnacle Pristine Shingle is of a different shape, size, and exposure. So, any proposed partial replacement of spot shingles will not fit into the roof system. In both the discontinuation notice and the installation instruction enclosed as Exhibit E, the manufacturer expressly states that these shingles "can not [sic] be used together on a roof or as a replacement for each other"; "Do not mix with material bearing different color name or other product sizes on the same roof'; and "Failure to follow these instruction [sic] may result in serious damage to the application and life of this roofing product, resulting in the termination of any warrant [sic], expressed or implied".
>
> In short, following the current roofing repair scope from American Family would violate the building code and would negate the warranty on the roof. This is not an acceptable scope of repair for the roofs.

(Dkt. 20-1 at 2; *see also* Dkt. 20-1 at 36 (discontinuation notice); Dkt. 20-8 at 15-16, 22-

23, 48 (deposition testimony identifying shingles on the roofs as "Franklin old style

Pinnacle Pristine" shingles and stating that those shingles had been discontinued).)

According to the shingle manufacturer Atlas, "[t]he previous Pinnacle Pristine shingle

and the new Pinnacle Pristine featuring HP Technology **can not [sic] be used together

on a roof or as a replacement for each other**. The two different size shingles with

different exposures will not line up together and install correctly."  (Dkt. 20-1 at 36

(emphasis in original).)  Atlas's instructions for the Pinnacle Pristine shingles state "DO

NOT MIX WITH MATERIAL BEARING DIFFERENT COLOR NAME OR OTHER

PRODUCT SIZES ON THE SAME ROOF" in the "WARNINGS & PRECAUTIONS" section.  (Dkt. 20-1 at 44.)

Since there was a disagreement between the parties as to the scope and amount of the loss, Rose Hill demanded an appraisal pursuant to the appraisal provision stated in the applicable insurance policy and pursuant to Minn. Stat. § 65A.01. (Dkt. 20-1 at 3.)

## C.    Appraisal

The appraisal took place on July 7, 2020.  (Dkt. 20-8 at 13.)  American Family chose Tracey Steiner ("Steiner") as its appraiser. (Dkt. 20-10 at 13.)  Rose Hill named Paul Norcia ("Norcia") as its appraiser.  (Dkt. 20-1 at 3.)  Norcia and Steiner chose Shannon Pierce ("Umpire Pierce") as the Umpire for the appraisal.  (Dkt. 20-10 at 13.) Umpire Pierce has a degree in engineering, with a focus on structural engineering, has built homes in the past, and has served multiple times as an umpire and an appraiser with respect to insurance claims.  (Dkt. 20-10 at 7-8.)  Rose Hill's appraiser, Norcia, testified that a lot of appraisal issues come down to "past experience in dealing with property losses."[2]  (Dkt. 20-10 at 53.)  Norcia also acknowledged that although the evidence presented should be weighed, "we're there to use our experience somewhat" and that experience "enters the equation all of the time."  (Dkt. 20-10 at 62, 97.)

The exhibits submitted to the panel by Rose Hill before the appraisal included, but were not limited to, Rose Hill's counsel's December 17, 2019 letter to American Family setting forth Rose Hill's position along with the following enclosures:

---

[2]      Neither party deposed Steiner.

- Allstar Construction Estimate and Scope of Repair;

- ITEL report – Shingle, dated September 27, 2019;

- ITEL report – Siding, dated September 27, 2019;

- Notice of Discontinuance of Pinnacle Pristine Shingle; and

- Installation Instructions for Pinnacle Pristine Shingles.

(Dkt. 19 at 6 (identifying submissions to panel); Dkt. 26 at 4 (identifying submissions to panel); *see also* Dkt. 20-1 (Rose Hill's counsel's December 17, 2019 letter).)  As to the ITEL reports, ITEL is an independent laboratory that evaluates building materials to identify matching or similar products available in the marketplace.  (Dkt. 20 ¶ 5.)

American Family submitted the following exhibits to the panel:

- American Family's October 14, 2019 estimates;

- Rose Hill's counsel's December 17, 2019 letter; and

- an April 14, 2020 letter from American Family to Rose Hill stating that the policy did not cover loss in value to any property due to mismatch between undamaged material and new material used to repair or replace damaged material.

(Dkt. 19 at 6 (identifying submissions to panel); Dkt. 26 at 4 (identifying submissions to panel); *see also* Dkt. 20-4 (American Family's April 14, 2020 letter).)  In addition, American Family submitted to the panel a November 7, 2019 ITEL report for the shingles used on the roofs, which stated:

> The exact original manufacturer of the sample provided could not be determined.  There ARE SIMILAR MATCH(ES).  Based on detailed color granule comparison, the selection(s) listed are the closest possible in overall physical characteristics and color comparisons.  Installers should verify visual and dimensional compatibility before purchasing and installing replacement products.  The original sample has weathering and granular loss.

The sample was cleaned with a mild bleach solution prior to color granule analysis.

(Dkt. 20-3 at 1; *see also* Dkt. 19 at 6 (identifying submissions to panel); Dkt. 26 at 4 (identifying submissions to panel).)

In that report, ITEL identified an Atlas Roofing Castlebrook shingle as a certified match to the shingles used on the roofs. (*Id.* at 2.) The November 7, 2019 ITEL report stated—and it is undisputed—that the matching Castlebrook shingle had the same physical dimensions and physical characteristics as the sample provided. (*Id.* at 1; *see also* Dkt. 20-8 at 26 (Umpire Pierce testifying that the Castlebrook shingle identified by ITEL had "identical" physical characteristics and dimensions as to "what was on the roof"); Dkt. 20-10 at 87 (Norcia testifying that the Castlebrook and discontinued Pinnacle Pristine shingles were the same size); Dkt. 19 at 7 (Rose Hill describing shingle identified by November 7, 2019 ITEL report as having "the same dimensions" but as "a different shingle product than the existing shingles on the roof").) ITEL identified three suppliers of the Castlebrook shingle, two Menards stores in St. Paul, Minnesota, and one in Cottage Grove, Minnesota, and noted that specific products and colors may need to be ordered. (Dkt. 20-3 at 2.)

Two representatives from Allstar appeared on behalf of Rose Hill at the appraisal, and Allstar brought a bundle of shingles that Norcia described as "the Atlas shingle that was the current shingle in production at the time." (Dkt. 20-10 at 23-24.) The record is unclear as to which shingle the Allstar representatives brought to the appraisal. Norcia believed that the Association brought the current "oversized" Pinnacle Pristine shingles

to the appraisal.  (*Id.* at 27.)  Norcia's "understanding" was "that the shingle that was produced by Atlas at the time was the Pinnacle, not the Castlebrook," and he was unaware "of whether or not the Castlebrook existed."  (*Id.* at 26.)  Umpire Pierce testified that the Allstar representative brought "the Atlas Roofing Castlebrook SuperWide 42 max or something like that"—which was not the shingle identified in either ITEL report—because the Allstar contractor stated he could not get the Castlebrook identified in the ITEL reports "at whatever Menards he went to down the road."  (Dkt. 20-8 at 25, 85-88.)  Umpire Pierce further testified that Allstar acknowledged that there were other shingles of similar dimensions that could be used for the repairs.  (Dkt. 20-9 at 85-86, 88.)

American Family did not have any roofing contractors, engineers, or other construction professionals appear at the appraisal.  (Dkt. 20-9 at 84-85.)  Norcia testified that American Family brought a sample shingle having the same dimensions as the Pinnacle Pristine shingles on the roof to the appraisal (Dkt. 20-10 at 81), while Umpire Pierce testified that American Family did not bring any shingle to the appraisal (Dkt. 20-8 at 16-17).

As part of the appraisers' deliberations, all three appraisers agreed that the necessary scope of roofing repair included replacement of metal valleys and other metal roofing accessories, and that for replacement of each valley it would be necessary to remove three feet of shingles on either side.  (Dkt. 20-5 at 12, 14; Dkt. 20-10 at 16-18.)  However, Norcia and Steiner disagreed about whether it was also necessary to remove and replace all the other shingles on the roofs or whether replacing the shingles on either

side of the valleys was sufficient.  (Dkt. 20-5 at 10-12.)  In her proposal, Steiner noted

that Rose Hill's two contractor representatives (the Allstar representatives) agreed there

were shingles made by other manufacturers which are of the same physical dimensions of

the shingles on the roofs, so there was no need to only rely on the shingles they brought

to the hearing, "shingles that could be cut in any event."  (*Id.* at 12.)  Steiner opined that

the shingles were extremely repairable and saw no reasons to replace the entire roof, and

that the argument presented by the Allstar representatives was unconvincing.  (*Id.* at 13.)

Norcia countered:

> From the testimony and information provided the roof is not repairable based on the shingle recommended through ITEL by both parties.  There was absolutely no evidence presented by American Family that a shingle exists to repair the roof and there was no admission by Allstar that they would use any shingle of similar size to the existing shingle would be used to conduct repairs.  We are bound only by the evidence presented.

(Dkt. 20-5 at 11.)

Steiner took exception to Norcia's statement that there was no evidence presented

by American Family to support their position:

> Not only did American Family provide an ITEL that shows shingles are available with the identical profile of the Atlas shingles, but also All Star confirmed themselves, in their statements today, that other manufacturer's shingles of the same size currently installed on the roofs are available for patching.  Obviously, the All Star reps did not wish to spend much time talking about that since it counters their allegation that the roof cannot be repaired without replacing the entire surface area.  While I can appreciate their attempt to turn this into a repairability issue, this is solely a matching issue for the roofs, with plenty of evidence provided for us to all know that these roofs are repairable.  Amongst the three of us, we have decades of experience with roofs

(*Id.* at 10.)

After Norcia and Steiner continued to argue about what the Allstar representatives said at the appraisal, Umpire Pierce notified the parties that he wanted to have a conference to discuss the findings and to settle the appraisal dispute on July 29, 2020. (*Id.* at 8.)  On July 29, 2020, Umpire Pierce communicated to Norcia and Steiner that, "It has been shown that there are reasonable matches for both the siding and the roofing, and therefore full replacements are not warranted."  (*Id.* at 5.)

On August 11, 2020, Umpire Pierce issued an appraisal award statement that Steiner also signed.  (Dkt. 20-6.)  Norcia did not sign the award.  (Dkt. 20-8 at 34.)

After receiving the award, Rose Hill's counsel wrote an email to the panel asking for clarification on two issues in the award and received the following response from Umpire Pierce:

> 1. Did the panel determine that the shingle presented by the Association was a reasonable match to the current shingle on the roofs?
>     a. [From Mr. Pierce] The shingle that was brought to the appraisal deliberation meeting at the site was not the shingle that itel confirmed as a match.
>
> 2. Did the panel determine that the Association can use the proposed shingle for the repairs allocated in the award?
>     a. The association can use whatever shingle they desire.

(Dkt. 20-7 at 1.)

When asked to clarify his response to counsel, Umpire Pierce testified at his deposition that:

> My answer "The Association can use whatever shingle they desire" harks back to the evidence that was provided to the panel in that there is a non-matching clause to this claim.  So if they wanted to use a purple shingle or a green shingle – they can use whatever shingle they desire.  Perhaps I could have added "as long as it's a watertight repair."

(Dkt. 20-8 at 36.)

Umpire Price also testified that what he was trying to get across in his emails was that there was a matching shingle available (the Castlebrook) that was the same size as the original shingles based on the ITEL reports, although no one specifically testified that the Castlebrook could be used to make repairs.  (Dkt. 20-9 at 92-93.)  When asked what evidence he relied on when finding a shingle different from those on the roofs could be used, Umpire Pierce testified as follows:

> Q.    Was there any evidence presented that a shingle different than the one on the roof, could be -- could be integrated into the existing roof?
>
> A.    Yes.
>
> Q.    And what was that?
>
> A.    The ITEL reports both submitted were identical, I believe -- both by the contractor, the insured, and American Family.

(*Id.* at 19.)

According to Umpire Pierce, there was testimony at the appraisal from Sharon Larsen from American Family that "due to the non-matching clause in the policy language, as long as the shingle -- whatever shingle is used provided a watertight repair for the replacement of the soft metal elements, then that's all -- then that's what would be necessary to complete the repairs adequately, is the watertight seal."  (Dkt. 20-8 at 18.) Although color matching "was not an issue" due to the non-matching clause (*id.*), Norcia testified that the Castlebrook shingle and discontinued Pinnacle Pristine shingle on the roofs had the same color name (Dkt. 20-10 at 87).

When asked how it was determined that the shingles listed in the ITEL reports would properly integrate into the existing roof and make a watertight seal, Umpire Pierce responded: "You know, I don't recall it ever being discussed.  Again, as I mentioned earlier I -- I've installed shingles, roofing shingles before.  Any competent roofing contractor can make any shingle watertight, whether it matches perfectly in dimensions or not."  (Dkt. 20-8 at 37; *see also id.* at 18.)  Umpire Pierce also noted that with respect to whether the replacement would provide a watertight seal, "we had roofing contractors there, and the panel, that are all well versed with roofing and roofing repairs.  So the exact methods were not discussed in detail."  (*Id.* at 19.)  He testified that he would typically recommend using different types of shingles for a roof repair, had not seen using different shingles or integration of different shingles into spot repairs as a problem, and had come across the use or integration of different shingles "numerous times on numerous different buildings."  (*Id.* at 26-27.)  Umpire Pierce testified that any shingle placed on the roof could provide a watertight seal, and when asked for the supporting evidence, he stated that Steiner mentioned verbally on more than one occasion, basing it on her experience of being on numerous roofs as an independent adjuster, and numerous appraisals and repairs around vent caps.  (*Id.* at 29-30.)  Umpire Pierce agreed with her opinion based on his experience as an engineer.  (*Id.* at 31.)  When asked if using a different shingle than the one existing on the roof would be allowable per the shingle manufacturer's installation instructions, Umpire Pierce answered: "I can't answer that. Every installer's instructions are different."  (*Id.* at 37.)

During his deposition, Norcia examined each of the documents submitted as part of the roofing dispute that were presented to the panel by the parties and testified that the panel had deliberated over each one of them.  (Dkt. 20-11 at 108-113.)  Umpire Pierce also examined the same documents and testified that the panel had considered each of them.  (Dkt. 20-9 at 70-74.)  Norcia agreed that Umpire Pierce considered all of the evidence presented as part of the appraisal.  (Dkt. 20-10 at 94.)  Umpire Pierce also testified that he did not gather or consider evidence outside of the proceedings.  (Dkt. 20-8 at 50.)

## II.   LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  As this wording suggests, the initial burden of showing that no genuine issue of material fact exists lies with the movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A factual dispute is "material" only if resolving it might affect a suit's outcome under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Furthermore, a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").  When assessing a summary judgment motion, a court should believe the nonmovant's evidence and draw all

justifiable inferences in the nonmovant's favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

## III.   <u>ANALYSIS</u>

Pursuant to Minnesota law, an appraisal award is presumed to be valid and accurate and should be sustained even if the court disagrees with the result. *See Mork v. Eureka-Security Fire & Marine Ins. Co.*, 230 Minn. 382, 391, 42 N.W.2d 33, 38 (1950) (every reasonable presumption is exercised in favor of the finality and validity of the award). This is because "[a]wards mean something." *Robertson v. Boston Ins. Co.*, 184 Minn. 470, 472, 239 N.W. 147 (1931). "The law appears to be well settled that in appraisals under the provisions of insurance policies the parties are entitled to be heard and to an opportunity to present evidence." *Dufresne v. Marine Ins. Co.*, 157 Minn. 390, 392, 196 N.W. 560, 561 (1923) (collecting cases). That said, an appraisal award "will not be vacated unless it clearly appears that it was the result of fraud or because of some misfeasance or malfeasance or wrongdoing on the part of the appraisers." *Robertson v. Bos. Ins. Co.*, 184 Minn. 470, 472, 239 N.W. 147, 147-48 (1931) (citations omitted); *see also Baldinger v. Camden Fire Ins. Ass'n*, 121 Minn. 160, 162, 141 N.W. 104, 105 (1913) ("It is settled law that an award is not invalidated because of mere inadequacy. To invalidate the award, the inadequacy must be so gross as to justify a legitimate inference and finding of fraud."). A party seeking to vacate an appraisal award has the burden to prove the appraisal panel exceeded its authority. *See generally*, *Nat'l Indem. Co. v. Farm Bureau Mut. Ins. Co.*, 348 N.W.2d 748, 750 (Minn. 1984). The party attacking an appraisal award must allege the grounds by direct and specific allegations of fact and not

by way of general conclusions. *See McQuaid Market House Co. v. Home Ins. Co.*, 147 Minn. 254, 180 N.W. 97 (1920).

In its opening brief, Rose Hill argues that the appraisal should be vacated because Umpire Pierce and Steiner based the award "upon their personal knowledge to the exclusion of pertinent evidence offered by the parties."[3]  (Dkt. 19 at 20; *see generally id.* at 15-20 (argument).)  In support of this argument, Rose Hill relies on *American Century Insurance Co. v. District Court, Ramsey County, Second Judicial Dist.*, 125 Minn. 374, 377, 147 N.W. 242, 243 (Minn. 1914), and *Schoenich v. American Insurance Co.*, 109 Minn. 388, 391, 124 N.W. 5, 6 (1910).  The Court discusses those cases below.

In *American Century*, the primary issue before the Minnesota Supreme Court was whether an attorney could serve as an appraiser of clothing destroyed in a fire because he had never been a dealer in men's clothing or furnishings.  *Id.* at 376, 243.  The court found that it "is undoubtedly desirable that those making an appraisal be familiar with the matters and things which they are called upon to appraise; but, unless so stipulated in the contract, it has never been held, so far as we are aware, that experts only are competent as such arbitrators or appraisers."  *Id.* at 379, 244.  What was necessary was not an expert as an appraiser, but rather that the party had "a right to be heard."  *Id.*  Indeed, the Minnesota Supreme Court found that an appraiser "must afford the parties a reasonable opportunity to be heard and to present their evidence, and that, although they may make a personal examination of the premises and of the property under proper circumstances,

---

[3]     Rose Hill does not allege fraud or other malfeasance.

they cannot base the award upon their personal knowledge **to the exclusion** of pertinent evidence offered by the parties." *Id.* at 378, 243 (emphasis added).  In applying this rule, the court found that unless the policy says otherwise, appraisers shall not "make the appraisement upon their own judgment without permitting the parties to present their evidence, and the right to be heard and to present evidence in accordance with the rules . . . has not been surrendered." *Id.* at 379, 244.  In support of this proposition, the *American Century* court relied on *Janney, Semple & Co. v. Goehringer*, in which an appraisal panel had made an award without receiving evidence from the parties or providing them with any notice, and the Minnesota Supreme Court upheld the district court's decision to vacate that award on due process grounds finding that "In such a case the parties had the **same right to be heard** before their cause was adjudged as they would have in any general arbitration."  52 Minn. 428, 432, 54 N.W. 481, 481-82 (1893) (emphasis added).

In *Schoenich*, the three referees examined the premises at issue, took measurements, made estimates of the quantities of material and labor necessary to restore the same to their previous condition, conferred, and signed an award as to the damage without providing the insured any "notice of any time or place where she might appear before them and offer evidence as to the extent of her damages."  109 Minn. 390-91, 124 N.W. at 5.  The Minnesota Supreme Court overturned the appraisal because the insured was not given any opportunity to provide evidence, finding that:

> [Referees] must be disinterested, and determine the matters before them upon proper evidence.  They are not vested with absolute authority to make independent inquiry and investigation, and base their judgment on the result

of such examination.  It is the purpose of the statute to give the parties interested reasonable opportunity to present evidence.

*Id.* at 391, 5.

In sum, both *American Century* and *Schoenich* focus on the requirement that interested parties be given notice and a reasonable opportunity to present evidence at an appraisal, and prohibit appraisers from basing an award on their personal knowledge to the exclusion of pertinent evidence offered by the parties.  They do not, however, prohibit an appraiser using their experience as part of an appraisal, and indeed, Rose Hill concedes in its opposition to American Family's Motion that "appraisers often use their experience and expertise to help them make a determination."  (Dkt. 29 at 10.)  Rose Hill argues, however: "While it is acceptable for appraisers to impute their own knowledge and background to come to their conclusion, there is not one case presented by American Family which supports its position that an award can be based solely on the panel's opinion or expertise **while disregarding uncontested evidence presented to it**."  (*Id.* at 11 (emphasis added).)

With that in mind, the Court turns to Rose Hill's specific arguments.  In its opening brief, Rose Hill's argument focuses on whether the current Pinnacle Pristine shingle, which is larger than the discontinued Pinnacle Pristine shingle currently on the roofs, could be mixed with those discontinued shingles (i.e., used for patching instead of a full replacement).  (Dkt. 19 at 16-17 (discussing "available Pinnacle Pristine," "new model of the Pinnacle Pristine," discontinuation notice for Pinnacle Pristine, and difference in sizes between previous and current Pinnacle Pristine shingles); *id.* at 18

(quoting Steiner's email statement that "Ms. Steiner stating: 'there is no need to rely on the shingles [Allstar] brought this morning, shingles that could be cut in any event'").) Rose Hill states that it offered the following evidence at the appraisal supporting that full replacement as opposed to patching was necessary: (1) the discontinuation notice stating that the previous Pinnacle Pristine shingle and the new model "can not [sic] be used together on a roof or as a replacement for each other" and that the "two different size shingles with different exposures will not line up together and install correctly"; (2) the installation instructions for the Pinnacle Pristine shingles, which warn: "DO NOT MIX WITH MATERIAL BEARING DIFFERENT COLOR NAME OR OTHER PRODUCT SIZES ON THE SAME ROOF"; and (3) witness testimony from two contractors from Allstar who appeared at the hearing and submitted estimates supporting the necessary removal and replacement of the roofs' shingles. (Dkt. 19 at 16-17.) Rose Hill asserted that American Family provided no evidence to contradict its position or any of the evidence presented by Rose Hill. (*Id.* at 17.)

As to the Castlebrook shingle identified in the November 7, 2019 ITEL report as a match for the Pinnacle Pristine shingles on the roofs, Rose Hill argues in its opening brief:

> American Family submitted an ITEL report of a different shingle product than what was on the existing roofs and claimed that, because the report shows these shingles are the same dimension and available on the market, those can be used to make the repairs. Yet, no testimony was provided at the hearing that the shingle discussed in the American Family offered ITEL report could be used to make repairs to the property.

(*Id.* at 17.)

American Family responds that all that due process requires is that the interested parties had an opportunity to be heard by the panel and the panel considered all of the evidence presented to it (Dkt. 26 at 1, 3) and that Umpire Pierce and Norcia both testified that the panel had deliberated over all of the documents presented to it (*id.* at 6, 12-13). American Family further argues that the appraisers were entitled to apply their own expertise to inform their analysis, that both Umpire Pierce and Norcia testified that they relied on their experience in drawing their conclusions, and that Rose Hill has "disingenuously directed" its complaints about appraisers relying on expertise only to the "parts of the appraisal that did not go [Rose Hill's] way." (*Id.* at 13-17.)

In its response brief, Rose Hill no longer focuses on the mismatch in size between the discontinued and new Pinnacle Pristine shingles. Instead, Rose Hill argues that Umpire Pierce and Steiner concluded "that 'any shingle' can be properly integrated into the existing roofs," that "the spot replacement of the shingles was not acceptable or possible because the existing shingles were discontinued and, therefore, the proposed repair scope from American Family would violate the building code and negate the warranty of the roof," and that "any other type of shingles would not properly seal together." (*Id.* at 1, 3).[4]

---

[4]    Rose Hill cites "Dkt. 20-5, Ex. 1" in support of its statements regarding the warranty and sealing, which the Court understands is a reference to the Pinnacle Pristine instructions, which warns: "DO NOT MIX WITH MATERIAL BEARING DIFFERENT COLOR NAME OR OTHER PRODUCT SIZES ON THE SAME ROOF" and are marked both an "Exhibit E" and "Exhibit 1." (Dkt. 20-1 at 44.)

The sole question before the Court is whether the appraisal panel violated Rose Hill's due process rights.  It is not whether the panel correctly concluded that the roofs could be patched.  Rather, for purposes of due process, the issue is whether Rose Hill was afforded "a reasonable opportunity to be heard and to present [its] evidence" and whether Umpire Pierce and Steiner "base[d] their award upon their personal knowledge to the exclusion of pertinent evidence offered by the parties."  *See American Century*, 125 Minn. at 377, 147 N.W. at 243.

As Rose Hill acknowledges, before the appraisal, "American Family submitted an ITEL report of a different shingle product than what was on the existing roofs and claimed that, because the report shows these shingles are the same dimension and available on the market, those can be used to make the repairs."  (Dkt. 19 at 17 (citing November 7, 2019 ITEL report).)  In other words, Rose Hill had notice **before the appraisal** that American Family was taking the position that the identically sized Castlebrook shingle identified by the November 7, 2019 ITEL report could be used for patching and a full replacement was not required.  Rose Hill had the opportunity to present evidence during the appraisal that the Castlebrook shingle (or any other shingle having the same physical dimensions as the Pinnacle Pristine shingles on the roofs) could not be used for patching, whether because the shingle would not create a watertight seal, would invalidate the warranty or violate the installation instructions, or for some other reason.  Rose Hill did not avail itself of that opportunity.  And while Rose Hill argues that its due process rights were violated because American Family brought no witnesses who affirmatively testified that the Castlebrook shingle (or another identically sized

shingle) could be used for patching who Rose Hill could then cross-examine (Dkt. 29 at 7-9), nothing prevented Rose Hill from presenting evidence, whether through the Allstar representatives or otherwise, that those shingles would not result in a watertight seal or that their use would violate installation instructions, a warranty, or the building code.

As discussed above, *American Century* does not prohibit an appraiser from relying on her professional experience; it prohibits an appraiser from "bas[ing] the award upon their personal knowledge **to the exclusion of pertinent evidence offered by the parties**." 125 Minn. at 377, 147 N.W. at 243 (emphasis added). Rose Hill has not identified any "pertinent evidence" offered at the appraisal indicating that the Castlebrook shingle or other identically sized shingles could not be used for patching the roofs.[5] Further, there is no evidence that the panel disregarded any of the documents or testimony submitted at the appraisal hearing. Norcia examined each of the documents submitted as part of the roofing dispute that were presented to the panel by the parties and testified that the panel had deliberated over each one of them. (Dkt. 20-11 at 108-113.) Umpire Pierce also examined the same documents and testified that the panel had considered each of them. (Dkt. 20-9 at 70-74.) Norcia agreed that Umpire Pierce

---

[5]     Although Norcia suggested in his deposition that the Castlebrook shingle was not available based on Allstar's statements at the hearing (Dkt. 20-10 at 83-84), Rose Hill did not argue that Umpire Pierce and Steiner disregarded evidence that the Castlebrook shingle was not available, and instead acknowledges that the November 7, 2019 ITEL report "shows these shingles are the same dimension and available on the market, those can be used to make the repairs" (Dkt. 19 at 17). The November 7, 2019 ITEL report identifies three Menards in St. Paul and Cottage Grove as suppliers of the shingle and states that the specific products and colors may need to be ordered (Dkt. 20-3 at 2), and Rose Hill has not argued that Umpire Pierce and Steiner were not entitled to rely on that evidence to conclude the Castlebrook shingle was available.

considered all of the evidence presented as part of the appraisal.  (Dkt. 20-10 at 94.)
Umpire Pierce also testified that he did not gather or consider evidence outside of the
proceedings.  (Dkt. 20-8 at 50.)

Having conceded that appraisers may rely on their own expertise, Rose Hill's due
process argument boils down to assertions that Umpire Pierce and Steiner's conclusions
have no evidentiary basis and that they "disregarded" and "excluded" uncontested
evidence presented to them in favor of their own opinions and expertise.  (Dkt. 29 at 9-
11.)  The Court is not persuaded.

First, while Rose Hill argues that Umpire Pierce and Steiner concluded that "'any
shingle' can be properly integrated into the roofs . . . based solely on the[ir] opinions"
(Dkt. 29 at 1), the record is clear that Umpire Pierce and Steiner based their conclusion as
to patching the roofs on the evidence of the November 7, 2019 ITEL report identifying
the Castlebrook shingle as a match.  Steiner stated in response to Norcia's comments on
her appraisal: "**Not only did American Family provide an ITEL that shows shingles
are available with the identical profile of the Atlas shingles**, but also All Star
confirmed themselves, in their statements today, that other manufacturer's [sic] shingles
of the same size currently installed on the roofs are available for patching."[6]  (Dkt. 20-5

---

[6]     Norcia disagreed with Steiner that the Allstar representatives had testified that
other shingles were available for patching (Dkt. 20-5 at 11), while Umpire Pierce testified
that he "was clear that Allstar acknowledged that there were other shingles out there"
(Dkt. 20-9 at 88).  This dispute is not relevant to the question of due process, as Steiner
and Umpire Pierce based their conclusion that patching was acceptable on the November
7, 2019 ITEL report identifying the Castlebrook shingle as a match as well as their
experience.

at 10 (emphasis added).)  Umpire Pierce similarly concluded that there were "reasonable matches" for the roofing (Dkt. 20-5 at 5) and testified that he had concluded, based on the November 7, 2019 ITEL report, that the Castlebrook shingle identified in that report had the same physical dimensions as the Pinnacle Pristine shingles on the roofs and was an acceptable match for both making a watertight repair and for the existing color (Dkt. 20-8 at 45-47, 60-61).

Second, notwithstanding Rose Hill's arguments about the warranty and building code (Dkt. 29 at 2, 3), Rose Hill has not identified any installation instruction or warranty that precludes patching the Rose Hill roofs using shingles of the same size as the Pinnacle Pristine shingles on the roofs, including the Castlebrook shingle identified in the November 7, 2019 ITEL report.  Rose Hill relies on the Pinnacle Pristine installation instructions, characterized as "advising against using different shingles for repairs," to support this argument.  (Dkt. 29 at 3.)  The Court is somewhat troubled by Rose Hill's reliance on those instructions, as it appears that counsel agreed during depositions that the instructions were for the "new" Pinnacle Pristine shingles.  (Dkt. 20-8 at 42-43.)  If that is the case, it is unclear why they would have any bearing on whether shingles can be "mixed" with the discontinued Pinnacle Pristine shingles on the roofs.  More importantly, and regardless of whether the instructions are for the discontinued Pinnacle Pristine shingles or the new Pinnacle Pristine shingles, the instructions warn against mixing Pinnacle Pristine shingles with "OTHER PRODUCT SIZES."  (Dkt. 20-1 at 44.)  They do not, however, warn against mixing Pinnacle Pristine shingles with shingles having the same product size, such as the same-sized Castlebrook shingle identified in the

November 7, 2019 ITEL report.  In other words, the installation instructions do not

preclude mixing same-sized shingles with the discontinued Pinnacle Pristine shingles on

the roofs, and Rose Hill has not identified any other evidence that doing so would be

contrary to any installation instruction, any warranty, or any aspect of the building code.

In sum, Rose Hill has not identified any "pertinent evidence" that the appraisers

did not consider, disregarded, or excluded.  Further, this case is plainly distinguishable

from the *Interlachen Property Owners Ass'n, Inc. v. American Family Mutual Insurance

Co.* case Rose Hill relies on in its response.  (Dkt. Dkt. 29 at 7-9.)  In *Interlachen*, the

appraisers did not allow the plaintiff's witnesses to testify at the appraisal and conducted

their own investigation outside of the record by contacting witnesses that were not

offered by the parties.  No. 27CV1112855, 2012 WL 7782584, at *4-5 (Minn. Dist. Ct.

Dec. 11, 2012).  Here, Rose Hill has not alleged that the appraisers prevented any witness

from testifying or contacted witnesses outside of the hearing.  Umpire Pierce and Steiner

properly relied on the November 7, 2019 ITEL report identifying the Castlebrook shingle

as a match and their own expertise to conclude that reasonable matches were available for

patching, and Rose Hill presented no evidence during the appraisal that the Castlebrook

shingle or identically sized shingles were not a match, would not result in a watertight

seal, or would violate the installation instructions or void a warranty.[7]  Because Rose Hill

had notice of American Family's argument that the Castlebrook shingle could be used for

---

[7]     Had Rose Hill put forward evidence that the Castlebrook shingle (or other shingles
having the same dimensions) could not provide a watertight seal or would violate
installation instructions, a warranty, or the building code, and the appraisers ignored this
evidence in favor of their own experience, there may have been a different result.

patching, had the opportunity to present evidence to the contrary at the appraisal, and did not do so, Rose Hill has not met its burden to vacate the appraisal due to a due process violation.  The Court therefore denies Rose Hill's motion, grants American Family's motion, and confirms the August 11, 2020 appraisal award.

## IV.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that:

1.   Plaintiff Rose Hill Villas Owners Association, Inc.'s Motion for Summary Judgment is **DENIED** (Dkt. 17);

2.   Defendant American Family Mutual Insurance Company Motion for Summary Judgment (Dkt. 24) is **GRANTED**; and

3.   The August 11, 2020 appraisal award is confirmed.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

DATED: November 10, 2021                 *s/Elizabeth Cowan Wright*
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge